Thank you, your honor. My name is Nat Man Shea, and I am privileged to be here to seek justice for the defendant-appellant Jonathan Toliver. And following up on your comment, I'm going to try to save five minutes for rebuttal. This case began and ended on September 13, 2004. The only event charged occurred on that date. And the case, every count against Jonathan Toliver, was based on a shooting that occurred that day and based on the Violent Crimes in Aid of Racketeering Statute, Section 1959, commonly known as VICAR. The case began to cave in on the prosecutor Bliss, and I would say at the outset that Ms. Olson had no involvement in this, but began to cave in on Prosecutor Bliss from two directions very early. First, it started to cave in based on federal jurisdictional grounds that this case did not fall within VICAR and did not fall within the statute. Second, there was simply very little evidence of Jonathan Toliver's guilt in the shooting. And it was Ms. Bliss's duty to rise above the debris caused by the cave-in as a minister of government and a minister of justice. But instead, she hid among the debris, concealing, withholding, and manipulating evidence, and by pursuing conviction based on a plain misreading of the VICAR statute. And the prosecution's claim of a federal crime and guilt under the first indictment back in 2004 was largely based on testimony from Antoine Hunt. You know, it's really tough enough for me to unravel this case without going through some background stuff that really isn't on the table. You just need a statement that is important, which is that, in your view, the government withheld a bunch of material evidence. So you might want to just focus on that instead of this. Yes, Your Honor. And I just wanted to bring that up because it seems to me the path is important. But the prosecution represented from early on that all witnesses had been disclosed. It represented that as of October of 2007, there were no eyewitnesses that named Jonathan Toliver because by that point, Antoine Hunt, his credibility had been destroyed. Can you help me out by focusing on the day, I guess, it was before the testimony was to occur, when disclosures were made? Now, if I've got it right, by the time you were at the plate for cross-examination, you knew that Black had had an interview back in 2004, and you knew about the photo array from which he identified Toliver. And you knew from the testimony that was taken outside the presence of the jury that at the time of the shooting, he was on Seroquel or however you pronounce the drug, and that he had been diagnosed with a bipolar disorder. So what is it that would have made any difference? By the time you got up for cross, did you not know? Well, what I didn't know, first of all, Your Honor, was I had no psychological or psychiatric records regarding Mr. Black. I had... The district court said he gave you some time. He gave me... I'm sorry. Yeah. I mean, it wasn't much time as it turned out, but he said, I'll give you time. So my impression was he was willing to say, look, okay, I realize you're just getting hit with this stuff. If you need time to deal with it, tell me. And I asked for time, and the judge gave me until 8 a.m. the next morning. Is that one of your appeal points? I think that's part of it, Your Honor. Let me just kind of separate these, because I guess I thought the appeal point was the Brady issue, and I didn't really see the timing as a separate appeal point. But maybe you can disabuse me of that. Well, I thought, and I hope, that they emanate the same, that not only does the prosecution have a duty to disclose exculpatory evidence, but it has a duty to disclose it at a time that the defense can make use of it. And that did not happen here. You did use it with cross-examination, didn't you? Well, I was able to use the fact that by then I knew he was in prison and I knew his prior conviction. But let me go back just a little bit. One of the main problems was that this evidence of Demetrius Black is disclosed to me the night before the trial started. The evidence said he was interviewed in 2008. It gave me no background information. I twice said before my opening statement in court, on the record in front of Prosecutor Bliss, that it was my understanding that Black just kind of fell out of the sky for the first time in January of 2008. I, therefore, in my opening statement, made that assertion, which turned out to be wrong. I did not know and was unable to tell the jurors in opening any of the other facts about his mental health issues, about the fact that he was in prison, about the fact that he had a motive. I thought you were able to say that he had been incarcerated. Not in my opening statement. I know, but opening statement is not evidence. So in other words, by the time he was, you know, by the time the cross-examination came to pass, what I'm having trouble is understanding why getting into his juvenile records, which the judge actually permitted to a degree, why that was necessary and why that would be warranted when normally those records are kept confidential. Well, first of all, Your Honor, I think under Davis v. Alaska, they were very relevant. But second, and I think more importantly, yes, I knew, as Judge Reimer pointed out, by the time I got up to cross-examine him, that his probation officer said he has this bipolar oppositional disorder and that he was taking Seroquel. And he has anger issues and he'd been incarcerated. Right. But what the district judge did not do was get any of his mental health records. The district judge asked the probation officer to fax over his record of adjudications. There was no formal request for records. There was certainly no request for medical records. There was no – I had no ability to get any of that information. Was there any reason to believe that that would have impeached him more than evidence that he had bipolar disorder and that he was on a drug at the time he reportedly saw Holliver at the crime scene? Sure, Your Honor. And I think at the very, very least, it would have to be remanded because – Well, no, but there's no braiding error unless it happens. Right. Why would that extra dog that you didn't get have made any difference? Why was it material? Well, but – If it were, you didn't have. It was material because we have the right to challenge that evidence by getting an expert. I mean, yes, the jury knew, okay, he had bipolar oppositional disorder, but no way to know how that influenced him or affected him. The Seroquel, according to the authorities that I've cited in the brief, impairs mental processes, is not appropriate for juveniles, and is something that if we'd had in a timely manner, we could have challenged Hugh's showing that it was – would have impaired Mr. Black. I – you know, I'm sympathetic because, you know, having this bombshell dropped on you at the last minute puts you in a very difficult position. But then the question is, and maybe following up on Judge Reimer, is how it affects the cross-examination. So did you ask for time to bring in, for example, a psychiatrist to talk about the fact that Well, Your Honor, I asked for time to investigate Mr. Black, and I don't recall if I was specific about it. I mean, I guess we're kind of – if you kind of go in sequence, first D.B., I guess, he's sort of been referred to as various things than this, he shows up on the scene in terms of having surfaced in 2004, but of course you didn't know that. Then you get some of his records, and you know the anger – they say anger, Seroquel, and bipolar. So I'm wondering, at that point, once you had a colonel, this information about his situation, did you ask for any further time, or was there anything in the record that we should look to where the judge addressed that point? Your Honor, I believe I asked for, first of all, the records. And the judge ruled that based on what he had heard, which was Black's own testimony and the probation officer's testimony, he didn't see any records at that point. He didn't think there was a mental health issue and cut me off on that. He gave me only the records of the adjudications, only sought the records of the adjudications.  I'm not saying that the judge should have been more involved in the adjudications. So the judge, I think, had no interest in the adjudications. So … Well, you know, there's not a – do we – does the prosecutor have these records? The prosecutor claimed that she had reviewed his records. What records? Well, it wasn't entirely clear. She said she'd reviewed his records. They showed he had no mental health problems. However, she never produced those, and that was contradicted by both Black's own testimony and the testimony of his probation officer. But the prosecutor first affirmatively hid the fact that Black was in prison, second claimed he had no adjudications. Then when confronted, said, oh, well, I saw his record. He only had one. And then when we got the actual records, it showed he had three. But the only records that were ever produced were the ones that were requested by the court the other day. And the judge's erroneous finding that there was no basis to look into his mental health situation cut me off. And I think that's where we are now. And I asked for as much time as the judge would give me. He gave me until 8 a.m. the next day. I didn't have any way to get Black's records beyond what the court would order, because they are confidential. And we had a right to them. Right. Well, but when you say you had a right to them, that's where maybe I'm having some trouble. One, they're confidential, they're juvenile, they're psychiatric or mental health records, which you wouldn't normally get. So why all of a sudden, since you're not entitled to them in general, do you get them under Brady? Because the medication and the diagnosis would have impacted the witness's ability to accurately perceive and recall. And that's what we're talking about. I mean, if he was on heroin, we would have had the right to know that. But he was on a drug that affects mental processes, that affects alertness, and that's not appropriate for juveniles, and he was a juvenile at the time. I mean, that much we've shown. And all of that can come out in cross-examination, correct? No, Your Honor. Cross-examining him, I couldn't, and this hampered me at kind of every turn, asking him about the effects of Seroquel is not going to get me very far. I need to have the opportunity to review his records and review whether or not he's an honest person, do investigation and get those records and have my expert look at them and challenge him. And that's what I was deprived of the ability to do here. And I would point out to the Court, by the time we went to trial, there was no direct evidence. I mean, the government has got to prove something other than the shooting under VICOC. It has to prove an enterprise. It has to prove a violent crime. It has to prove that the offense was committed in further uncertainty and support the defendant's position in the enterprise, which this Court examined and outlined and analyzed the quantum of proof in U.S. v. Banks. But here the fourth factor is the enterprise has to be engaged in racketeering. And the instructions here allowed the jury to make the finding that based on the same violent crime, murder, he was also, that also established the element of racketeering activity. Mr. Shane, I want to hear from you. Objection to that instruction. Absolutely, Your Honor. I'll follow the instruction. Can you take a comment? Both. Both. And I will provide. We have that. So why don't you, well, you're welcome to keep talking because this is a long and complicated case, but you might want to reserve your time. I will do that. Thank you. Thank you, Your Honor. And I'm sorry. Did you say you don't have that or you do have that as far as the objections? We have that. Okay. Thank you. We have the record. We have the whole record. Good morning. May it please the Court. Elizabeth Olsen for the United States Bailiwick Council. Just a couple of factual. Can you pull that microphone a little closer and speak up? Thank you. Just a couple of factual points with respect to the juvenile DB. He was not in prison. He was in a juvenile detention facility after an adjudication for fighting. He had gotten in a fight and was adjudicated juvenile delinquent and sent to that facility. The government never saw psychiatric records. The government spoke with the juvenile's caseworker at the facility and asked if there were any psychological issues of any kind that needed to be disclosed. And the caseworker said no. He was a highly intelligent kid who made some bad life choices, had some anger issues, needed some therapy, needed some counseling. But when he was admitted into the juvenile facility and his caseworker, Mr. Kermode, I think is how you pronounce it, he testified that when the juvenile was admitted into the facility, there was a notation on his record about bipolar disorder. And so they had him assessed by the psychologist at the facility to determine whether he needed to be on medication. And they said no, there was no need for him to be on medication. He needed to work through some of his anger issues. At that time he was 14. Now, when he testified outside the presence of the jury, he was asked on cross-examination about whether he was taking medication back at the time, when he was 10 and this happened. And he said that he was taking this drug called Seroquel for his anger. And there was no follow-up on that. I mean, there was no further testimony or anything about what this drug is. So what we have here, and then the district court, after hearing from the juvenile and after hearing from the caseworker, the district court said, you know, we'll take a look at his adjudications. And he ordered the government to get the juvenile adjudication record from the facility and disclose it to the judge, and then the judge would decide what should be disclosed to the parties. And I think you got my filing the other day. You had asked for a copy of that, and we sent that in a couple of days ago. And then the judge said, okay, well, pending taking a look at these adjudications, it does not appear to me that we have any kind of psychological issue that would require Brady disclosure. That's a factual finding that I don't think is clearly erroneous. I mean, we had testimony from the caseworker saying this kid had anger issues. There was a notation on his file when he came in that said something about bipolar, but he was assessed, and it was determined that he really just needed some therapy to work through his anger issues. So that's what we have on the psychological. Well, he was a very crucial witness, was he not? He was the only eyewitness that put Tutalibar at the scene. And that's true. He was the only one who did. It was a largely, I guess, circumstantial case against Tolliver. There was a lot of testimony about Tolliver, Bryant, and Cheese, the three sort of squad up guys who were involved in this. And there was testimony shortly before the shooting of people who saw the three of them together passing out guns. You know, a week before the shooting, the three of them had talked about how they were going to kill this guy. And then they were passing out guns together soon before the shooting. But at the actual shooting itself, there were witnesses who ID'd Bryant and who ID'd Cheese, but Mr. Blacker, sorry, DB, was the only witness who actually saw Tolliver, who was running away with Bryant and Cheese. He explicitly did not put a gun in Tolliver's hand. No, that's correct. What he said is he saw the three men running. He saw a gun in Bryant's hand. He saw a gun in Cheese's hand. And Tolliver was kind of, you know, the way he was angled. He couldn't see. He places him at the scene. He places him at the scene with Cheese, with Bryant, running away, you know, sort of running from the shooting when it occurs. But other witnesses saw the three men very not too long before the shooting all together. You know, a few days earlier, they had been passing around guns, and obviously there were witnesses to the confrontation where the three men confronted Carter, who was the intended victim of the murder, and said, you know, and where they were bragging or threatening that they were going to kill him. This was a gang dispute over drug territory, and we had witnesses. I mean, Christopher Westbrook testified. He was asked, what happens when somebody from the outside comes into a gang's territory and starts doing drugs? And he said, well, first we tell them to leave, and if they don't, we kill them. And that's exactly what happened. First we tell them to leave, and if they don't, well, then you do what you have to do. We have witnesses who saw the confrontation where these gang members are telling Carter that he has to leave, that this is squat-up territory. He testified. Carter himself testified that these three, Tolliver, Bryant, and Cheese, came to him and said, this is squat-up. You don't belong here. You get out of here. He said he wasn't going to leave. A few days later, these three men are saying that they're going to kill New Orleans. That was Carter's nickname. Again, about the witnesses, there's two important times when he identified or claims he saw Mr. Tolliver. That's 2004. Is that correct? Both. I mean, he had been interviewed soon after the shooting. Right. There's that point. Yes. And then there's the time of trial. Yes. And so there's when he's actually testifying, and whether drugs he's on at that point could affect his ability to recall or to be precise in his recall. And then there's actually what he might be able to recall or whether he was on drugs or had any kind of disabilities in 2004. Yes. Is there any evidence as to his situation in 2004? No. All we know is from his testimony, I mean, he said that he was taking this drug Seroquel. And that's the only reference to Seroquel. He said at trial that in 2004 he had been taking this drug Seroquel. But there's not — There was no follow-up on that. His record, if you look at the dates in his record of his various juvenile interactions, how do they mesh with the time of the identification? Because he has several events in 2004 that have been dismissed. Right. And then he has some later problems where he is incarcerated. It looks like there was a petty larceny allegation, which was denied for insufficient evidence right around the time of the shooting. That was September 2004. So just to be clear, at the time of the shooting, he's not in a facility. No. Oh, no. Right. No. I mean, he hadn't escaped or anything. And he wasn't then soon after put in a facility. It was later that he was put into a facility. Right. So that when he comes to testify, that's when they — he has to testify or they have the data that he's been incarcerated or at least in a juvenile facility. In the juvenile facility. Yes. Yes. And that was actually — I mean, the 302 of the interview in 2008 that was disclosed to the defendant prior to trial said that he was interviewed at the Spring Mountain, whatever it's called, Juvenile Mountain Camp something. I think that at the time — I mean, and I hope — the record, I think, is clear about sort of what happened with that 2004 interview. Soon after the shooting, Detective Tanner was the initial detective, primary detective on the case. He was talking to people, and he heard about this juvenile. And so he called the juvenile's mother, and she said, you can come see him at his psychologist's office. He was having nightmares, and he had these anger issues. And what Detective Tanner said is that, you know, this is a scared little boy. And at that point, I wasn't going to use him. I mean, he's — you know, we had — there was other evidence. As the defendant pointed out in his executive record, I mean, there had been a confession, which ended up — Under this act, is it essential that he be at the scene, or is it enough that he conspired or was aiding and abetting and all that? Well, one of the charges, one of the Vicar charges was conspiracy to murder Carter. So I think for that charge, his presence might not have been necessary. For the other charges, the assaults and the attempted murder charges, I suppose I can't remember if there was aiding and abetting. Our theory of the case was that he was there. And, I mean, we never argued that even if you find he wasn't there, you can still convict him of this. I mean, our theory of the case was that he was one of these three shooters, and that's — I didn't hear what you said there. Oh, our theory of the case was that Tolliver was one of the three shooters. We didn't make an argument that even if the jury — I mean, whether — and maybe we could have. I mean, maybe we could have said under an aiding and abetting theory he wouldn't have had to be there. But that — I mean, that's kind of a day late now. We never made that argument. We were — you know, our argument was that he was there. And we had a lot of witness testimony leading up to it. It's true that the juvenile was the only witness who actually put him on the scene at the shooting. So my — go ahead. Go ahead. Go ahead, please. Just so I understand, do you contend that the — it is necessary for him to have been there in order to fulfill the requirements of the act? I'm sorry. I haven't researched that question. I guess no, because I think that aiding and abetting violent crime in aid of racketeering — But you didn't argue that. We didn't. I mean, you know, the elements of the crime is that there's an enterprise, that the enterprise is engaged in racketeering, that the defendant committed a violent act, and that he did so for the purpose of maintaining or enhancing his position. So the defendant has to have done the violent act. Yeah. I wouldn't want to say definitively, because I haven't researched it, whether under an aiding and abetting. Gordon. For example, you have robbery, drugs, and attempted murder, right? As the enterprise racketeering? Right. Yeah. But, you know, some of those are not — The question of whether there's sufficiency of the evidence on those isn't exactly a slam dunk for the prosecution. Well, I'll tell you what. What we had is direct testimony. I mean, Christopher Westerbrook testified that he had direct, personal, first-hand — he was there knowledge — that Squad Up bought drugs from dealers in California to sell in Nevada. Now, if the jury believed him, and credibility determinations are for the jury, then I think we satisfy sufficiency, both the drug trafficking and the interstate nexus. I mean, that testimony. There was a lot of testimony, and Detective Bodner talked about — I mean, this whole thing was a dispute about drug territory. You know, they were confronting Carter because he was selling drugs in Squad Up territory, and he's not allowed to do that. And then when he wouldn't leave, they murdered him. So we've got that. Do you think it's enough if somebody gets on the stand and says, I know that these guys were selling drugs all over the place, which is kind of what he said. Well, I think — And I think it was Squad Up. And he doesn't have to say any names, dates, places, type of drug or anything. I mean, there was some reference to cocaine. Yeah. Is that all he has to say? On sufficiency, in this case, it was specific — I mean, it was specific information that Westerbrook was there when Squad Up was buying these drugs from these guys from California to sell in the Squad Up territory. Now, if it had been broader than that, I mean, if it had just been somebody who came in and said, oh, well, yeah, I know Squad Up deals drugs, and didn't have any sort of basis for it. I mean, if it was just kind of general either rumor or whatever, maybe that wouldn't be sufficient. But here, where you've got a witness saying, I have personal firsthand knowledge, I was there, that is a determination — I mean, that's a question of credibility. Either the jury believes that witness or they don't. And now, in light of all of the other evidence that what this whole thing was about was drug turf, you know, that sort of gives some credence to that direct testimony. But there was testimony sort of generally about what Squad Up was. They financed themselves by selling drugs. This was a drug dispute. And then you have one witness who specifically says, I have firsthand knowledge that they were dealing drugs that they got from these guys in California. He knew the names. I mean, street names, but it was Bosco and somebody else that I can't remember. You know, he was — they were — the guys in California were friends of his brother, and so he was there when they were doing this deal. So at that point, yeah, I think if the jury believes that testimony, which they have — you know, they make that determination, that's sufficient. This idea that — yes. Okay, finish. Oh, no, no, no. I just have to switch gears, Jenny, with me, to the racketeering activity instruction. Yes. Which is problematic in that it did not distinctly say that you have to have racketeering activity acts that are distinct from the crime and perhaps allowed the jury to convict because they believed that Tolliver and these guys in Squad Up murdered Henry. See, and I understand the argument. I don't see how that would happen, and here's why. The judge said there are four elements. You know, the government has to prove four elements. They have to prove that there was an enterprise. They have to prove that this enterprise was engaged in — that it was a racketeering enterprise, that it was engaged in a racketeering activity. Third, they have to prove that the defendant committed this violent crime. And fourth, they had to prove that his purpose was to maintain or enhance. You know, it was described to the jury as, you know, these are four different elements. Now, for the jury to decide that the violent crime itself could also be the racketeering that makes the enterprise a racketeering organization, and if they thought that was the only thing, I mean, you know, if there wasn't other racketeering activity, then basically they would be deciding that the enterprise became a racketeering activity at the moment that the violent crime in aid of racketeering was committed. And I mean, logically, because it was given as four separate elements, I just think logically it's really implausible that the jury would think that. I mean, there was no question about it. I mean, they didn't ask a question. They didn't express any kind of confusion about it. So I think that when the judge read the definition of racketeering, you know, racketeering can include, you know, murder, robbery, drug trafficking, whatever, and there had been quite a bit of evidence about attempted murders, you know, various shootings and stuff. But there wasn't, I think that that line, you know, if you look at the statute, that's how the statute defines racketeering activity. It includes murder. I mean, so I think he was sort of reading that definition of racketeering from the statute. And, you know, but what we were arguing was the shootings. Are you making an argument that the instruction itself just as such was not erroneous, or are you making an argument that, well, to the extent it is erroneous, it's harmless? I think that in and of itself, the instruction wasn't erroneous to the extent that it defined racketeering activity to include murder, racketeering activity. But in this case, given the facts of this case, I could see where it introduced some ambiguity to include murder in the racketeering activity definition when there hadn't been direct evidence of completed murders in this case. I could see where that would introduce some ambiguity. But given the instruction as a whole, and you have to look at the instruction as a whole, I think that any ambiguity there was harmless because given the instruction as a whole, I think the jury would have understood. Is it harmless because of the other instructions filled in the gap, or is it harmless because there was a ton of evidence which otherwise would have been totally unnecessary about all sorts of other attempted murders and drug trafficking and whatever? Both. But I think the second one, I mean, I think that because I think it was harmless because in this case, A, there was evidence of other attempted murders, drug trafficking, et cetera. B, the government wasn't arguing and actually disclaimed the idea that they could argue that the murder itself would satisfy the racketeering activity element. So I think that in the context of this case, given the evidence and the way it was presented, I think that in that case it would be harmless. So let me just be clear, too. From the U.S. Attorney's point of view, basically you're telling us that it's harmless here, but that in fact it could be fatal in other cases, so at a minimum the instruction ought to have the clarification that the defense proposed? Yes. I'll answer the question if you don't mind. My light just turned red. Yes, I think that in another case, if there were a case where, I mean, clearly the government can't, the racketeering, the violent crime can't satisfy the racketeering activity element itself. They are separate. Bootstrap. Right. You can't bootstrap one onto the other. And so in a case where the government was trying to do that or that was the only evidence where there wasn't other evidence, that could present a problem. I don't think it did in this case. Any other questions? I see my time is up. Thank you. If I may, first I want to correct something that Ms. Olson said. There was no notice that black was in a camp or facility or incarcerated at any time. That came out during the sealed conference. It's clear from the March 20th transcript that that had been hidden and wasn't known. Also, as far as the psychological issue, the court asked the caseworker to fax his adjudications over and said there was no psychological issue before it got any records. The records came after that. So that finding was based only on black's testimony and the probation officer's testimony. As far as the issues with the ---- Could I just ask another question on that? We had asked counsel and have now received the papers that were disclosed to you, I believe. Right. And is there another subset of papers that were not disclosed to you that the judge determined should not be disclosed? Apparently so, yes. But we don't know what those are. That's correct. And they are not in the district court records. So there would be no way to reconstruct that, correct? I believe that the judge told the clerk to put them in the sealed room. So they're there somewhere. But, of course, I've never seen them. Well, they're not listed anywhere and they're not available, at least to my knowledge, from the district court. No. The court did this, I think, on March 20th outside the presence of any counsel. So the only thing ---- there's a transcript where the judge tells his clerk to put the rest of the pages in the sealed room. But it is not anywhere that I can find other than that. Okay. Thank you. Sure. And I want to get back to the racketeering. I think it's so, so important because ---- and if you look at our brief, it's very specific as to what the other evidence was. And I think you hit the nail on the head that, yeah, you have Chris Westbrook, who's never a member of S.Q.U.A.D. and who says, yeah, they bought drugs from Bosco and somebody else, these dudes from California. Now, the prosecution's brief, I know, says in California. That's not what he said. He said they brought drugs from these guys from California. He didn't say when. He didn't say what numbers of S.Q.U.A.D. bought them. He didn't say anything about when or where it was. And this indictment is the only one I've ever seen or any case that ever refers to that has no notice of any other acts, of, you know, usually you've got other counts where they are drug counts. You've got drugs that were seized, drug ledgers, admissions, other gang members that testify, undercover officers. All you had here is Westbrook with his very vague testimony. And then I frankly did a lousy job of briefing this, but Bodnar, who's a case agent, the case detective, also testifies not just to modus operandi of drug dealers or rebuttal to the defense. He gets up and says, oh, yeah, S.Q.U.A.D. up was dealing drugs. S.Q.U.A.D. up had dope houses. But there's no foundation for it. It's just hearsay. I asked for foundation. I tried to get any sort of records that supported that. There were none. In gang cases, as the evidence showed here and your own detective said, they document gangs with field interview cards. And there was not in Las Vegas, the Metropolitan Department or North Las Vegas or the school district, a single field interview card for this alleged gang. There's no evidence of drug dealing beyond Westbrook. There's no evidence of robbery. And murder was never charged in the indictment as a racketeering act. So if the jurors get this instruction, first of all, it wasn't charged in the indictment. But second of all, there was no evidence of any other murder. So what are they to think? The only evidence we heard was of this murder. And to say it's not prejudicial, I would just ask the Court to review our briefs and the paucity of evidence of any other racketeering act, as well as the extremely limited evidence of Jonathan Tolliver's involvement. And this case cries out for reversal. Thank you. Thank you. Thank both counsel for your arguments this morning. The case of United States v. Tolliver is submitted.
judges: Hug, Rymer, McKeown